IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. _____

SCOTT L. HOWARD,

    Plaintiff,

v.

ARISTEDES ZAVARAS, Executive Director of the Colorado Department of Corrections, in his official capacity;
ROBERT CANTWELL, Director of Prisons, in his individual and official capacities;
SCOTT H. HALL, Warden of the Denver Reception and Diagnostic Center, in his individual and official capacities;
DONA ZAVISLAN, Associate Warden of the Denver Reception and Diagnostic Center, in her individual and official capacities; and
SERGEANT JANE DOE, Intake Sergeant at the Denver Reception and Diagnostic Center, in her individual and official capacities.

    Defendants.

_____

**COMPLAINT AND JURY DEMAND**
_____

Plaintiff, Scott L. Howard, by and through his attorneys, David A. Lane and Sara J. Rich of KILLMER, LANE & NEWMAN, LLP, respectfully alleges for his Complaint and Jury Demand as follows:

### I. INTRODUCTION

1.     Plaintiff Scott Howard is the victim of a prison system that fails to protect its inmates by implementing even the most basic security measures. While in the custody of the Colorado Department of Corrections ("DOC") at the Denver Reception and Diagnostic Center ("DRDC"), Defendant Intake Sergeant Jane Doe forced Mr. Howard into a cell with another inmate, Simon Shimbel, who was a known member of a security threat group ("STG") and who

was specifically named as a custody issue in relation to Mr. Howard in Mr. Howard's DOC case file. Defendant Sergeant ordered Mr. Howard into this cell despite Mr. Howard's pleas that he not be placed in the cell with this inmate due to the very real threat to his safety posed by this inmate. Once alone in the cell together, Inmate Shimbel sexually assaulted Mr. Howard.

2. Mr. Howard suffered, and continues to suffer, injuries from Defendants' failure to protect him from known threats while in the custody of the Colorado Department of Corrections at the Denver Reception and Diagnostic Center. Mr. Howard was deprived of his rights under the United States Constitution as a result of Defendants' knowing and deliberate indifference to the serious risk of harm and injury to Mr. Howard. This is a civil action pursuant to 42 U.S.C. § 1983 for Defendants' violation of Plaintiff Scott Howard's rights under the Eighth and Fourteenth Amendments to the United States Constitution.

## II. JURISDICTION AND VENUE

3. This action arises under the Constitution and laws of the United States, and is brought pursuant to Title 42 U.S.C. § 1983. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331. Jurisdiction supporting Plaintiff's claim for attorney fees and costs is conferred by 42 U.S.C. § 1988.

4. Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b). All of the events alleged herein occurred within the State of Colorado, and all of the parties were residents of the State at the time of the events giving rise to this litigation.

5. Plaintiff has exhausted all administrative prerequisites to the filing of this action.

## III. PARTIES

6. Plaintiff Scott L. Howard ("Howard") is a citizen of the United States and was at all times relevant hereto a resident of and domiciled in the State of Colorado.

7. Plaintiff Howard was an inmate of the Colorado Department of Corrections during the events giving rise to this Complaint. He is currently housed in the United States Penitentiary in Terre Haute, Indiana.

8. Defendant Aristedes Zavaras is a citizen of the United States and a resident of Colorado and is acting under color of state law in his capacity as the Executive Director of the Colorado Department of Corrections, and pursuant to Colorado state statute, and is the state official who manages, supervises, and controls the correctional institutions operated by the State of Colorado, including DRDC, and who is responsible for developing policies and procedures with respect to the operation of the Colorado Department of Corrections.

9. At all times relevant to the subject matter of this litigation, Defendant Robert Cantwell was a citizen of the United States and a resident of Colorado and was acting under color of state law in his capacity as the Colorado Department of Corrections Director of Prisons overseeing the operations of Colorado state prison facilities, including DRDC.

10. Defendant Scott H. Hall is a citizen of the United States and a resident of Colorado and is acting under color of state law in his capacity as the Warden of DRDC, and is the official in charge of all activities connected with the DRDC, including but not limited to establishing procedures for the operations of DRDC on a day-to-day basis, ensuring that all DRDC employees are properly trained, and establishing internal security procedures.

11.     At all times relevant to the subject matter of this litigation, Defendant Dona Zavislan was a citizen of the United States and a resident of Colorado and was acting under color of state law in her capacity as an Associate Warden of DRDC, overseeing operations, hiring, training, and supervision of staff at the DRDC.

12.     At all times relevant to the subject matter of this litigation, upon information and belief, Defendant Sergeant Jane Doe was a citizen of the United States and a resident of Colorado and was acting under color of state law in her capacity as an Intake Sergeant at the DRDC.

## IV. FACTUAL ALLEGATIONS

13.     While incarcerated within DOC in 2004 and 2005 Mr. Howard was recognized by inmates from media reports about his conviction for numerous theft charges and for Federal tax code violations. Specifically, he was recognized by members of the white supremacist prison gang called the "2-11 Crew."

14.     The 2-11 Crew is listed within DOC as a Security Threat Group. An STG is defined as "a group of three or more individuals with a common interest, bond, or activity characterized by criminal delinquent conduct, engaged in either collectively or individually, with the potential to create a security threat to DOC facilities or offices and/or functions within DOC."

15.     In late 2004 Howard was approached by 2-11 Crew members at Freemont Correctional Facility regarding his criminal endeavors and the possibility of assisting the gang in perpetrating similar crimes for the benefit of the gang leaders.

16.     Mr. Howard is obviously gay, and when 2-11 Crew members observed that

4

Howard was a homosexual, they began charging him "rent" and threatened him with physical violence if he refused to pay.

17.     Eventually, Howard was forced into prostitution and forced to perform sexual acts on inmates in exchange for money that was paid to the gang via canteen items. Howard was sexually assaulted approximately three times while housed at the Freemont Correctional Facility and was then transferred to Sterling Correctional Facility ("SCF") for his protection.

18.     While at SCF in 2005, Mr. Howard was viciously attacked on more than one occasion, both physically and sexually, by known 2-11 Crew members, including Simon Shimbel. On one occasion, Inmate Shimbel called Mr. Howard to the bathroom where Inmate Shimbel punched him in the stomach, pushed him into the far stall, and sexually assaulted him. On another occasion, Inmate Shimbel stood outside as a lookout while another inmate raped Mr. Howard.

19.     Mr. Howard was also extorted by the 2-11 Crew after he was told that his family would be harmed if he was unable to pay.

20.     In February 2006, Mr. Howard participated in an investigation conducted by Lawrence K. Graham, an investigator with the DOC Inspector General's Office. Inspector Graham filed a formal report detailing Shimbel's involvement in the extortion, sexual assaults and rape Plaintiff suffered.

21.     Upon information and belief, Inmate Shimbel was eventually disciplined by being housed in the Administrative Segregation Unit.

22.     As a result of Investigator Graham's report, DOC Offender Services staff member Rex Kohle generated an electronic record of "custody issues" in Plaintiff's file on DOC's

5

information system, called DCIS. This notice of custody issues was entered as a permanent "red flag" to alert DOC Staff, including but not limited to, the Inspector General's Office, Offender Services, facility intelligence officers, case managers, housing supervisors and other DOC personnel that Plaintiff was not to be placed in proximity to Shimbel at any time due to the substantial risk of serious harm to Plaintiff Howard.

23.     All DOC personnel have access to DCIS.

24.     Since the "custody issues" stemmed from Plaintiff's report of sexual assault and rape, the procedures of the Prison Rape Elimination Act of 2003, 42 U.S.C. § 15601, *et seq*. ("PREA") which are implemented through the DOC Administrative Regulation 100-40, were triggered. PREA mandates that the victim and the perpetrator not be placed in proximity to one another.

25.     On September 18, 2007, Plaintiff was housed at the Denver Reception and Diagnostic Center's Infirmary Unit where he was being released from the DOC and transferred to the custody of the U.S. Marshal Service. An officer escorted Plaintiff down the stairs from the Infirmary to the Intake Holding Area. The officer placed Plaintiff in a cell where several other inmates were waiting for release to the Immigration and Customs Enforcement Agency.

26.     Plaintiff was in that cell for approximately ten minutes when female Intake Sergeant opened the door and asked for Plaintiff's name and inmate number, which Plaintiff provided. Defendant Sergeant Jane Doe looked at a document she had in her hand and then asked if Plaintiff was a "U.S. Marshall hold." He confirmed this and Defendant Sergeant Jane Doe said, "I need to put you with the other marshal holds -- these guys are waiting for immigration." Plaintiff exited the cell and was escorted past several vacant cells to another

6

holding cell.

27. When Defendant Sergeant Jane Doe stopped at the holding cell, Plaintiff saw Inmate Shimbel standing in the doorway looking out of the window. Plaintiff said to Defendant Sergeant Jane Doe, "I can't go in there he's a custody issue." Defendant Sergeant Jane Doe replied that she was unaware of any custody issues. Plaintiff informed Defendant Sergeant Jane Doe that the information he was referring to was in DCIS and that she could look it up.

28. Defendant Sergeant Jane Doe had full access to the DOC computer system, DCIS, and should have checked the system prior to transferring Mr. Howard into the cell with Inmate Shimbel. Further, Defendant Sergeant Jane Doe could easily have confirmed Mr. Howard's statements after he warned her of the risk he faced if placed in the cell with Inmate Shimbel.

29. Defendant Sergeant Jane Doe ignored Plaintiff's request and waved her hand to have the control center open the cell door. Plaintiff became extremely anxious and scared and requested that Defendant Sergeant Jane Doe please "check the computer" to confirm the information that he was providing. At that point, the Sergeant threatened Plaintiff by advising him, "You ain't on parole yet, you know?" Plaintiff knew that disobeying a direct order could result in a Class II Code of Penal Discipline charge which would immediately stop his parole status. Thus, hearing he would not be released on parole if he failed to comply, he entered the cell, the Sergeant slammed the door, and he was left alone with Shimbel in the cell.

30. Shimbel immediately recognized Plaintiff upon his entry into the cell. Shimbel then began yelling at Plaintiff for "dropping his name" to corrections officers and blaming Plaintiff for his prior placement in Administrative Segregation at Sterling Correctional Facility. Plaintiff, scared for his safety, sat on the toilet not saying anything or even making eye contact

7

with Shimbel.

31.     Shimbel approached Plaintiff and put one hand on Plaintiff's shoulder and the other hand on Plaintiff's head, shoving him off of the toilet causing his head to hit the cement wall before falling to the floor.  Shimbel then became irate, calling Plaintiff a "fucking snitch" and "faggot."  Plaintiff remained on the floor in a fetal position anticipating a beating from Shimbel.  Shimbel leaned down and told Plaintiff, "the only reason I don't choke you the fuck out is because I'm leaving."  He then ordered Plaintiff to get off of the floor.  Plaintiff again sat on the toilet while Shimbel paced in the doorway, looking out the window to see where staff might be.  Shimbel said, "they say once you go black, you won't go back…let's find out." (Shimbel was referring to a friend of Plaintiff's at another COD facility who is African-American.)

32.     Shimbel then pulled out his penis, went back to look out the window, and returned to stand directly in front of the Plaintiff.  Shimbel told Plaintiff, "do what you do" and Plaintiff began crying.  Shimbel again checked out the window, came back to stand in front of Plaintiff, smacked Plaintiff on the back of the head, and forced him to perform oral sex.  After two to three minutes, Shimbel again pushed Plaintiff to the floor and then masturbated until he ejaculated into the toilet.  Shimbel told Plaintiff, "I can't give you any of that 'cause you'll take it to the pigs."

33.     Plaintiff then jumped from the floor and stepped around Shimbel, hitting the emergency call button by the cell door. An officer's voice came over the speaker asking "what's your emergency?" Plaintiff, still fearing Shimbel might physically attack him, told the officer that he needed his release clothes. The officer opened the cell door and Plaintiff stepped out.  At

8

that time, the Sergeant and U.S. Marshal Service deputies were walking towards him.

34. Plaintiff was given his "dress out clothes" and taken to a cubicle, with approximately 4 ½ foot walls, to be searched. Shimbel was placed in the cubicle next to Plaintiff and the marshals began the searches. While dressing Plaintiff attempted to alert the marshal to the situation. Specifically, Plaintiff told him, "I'm not supposed to be around Shimbel" and tried to explain that it was related to "a PREA issue." The marshal did not respond to Plaintiff's statements and placed Plaintiff and Shimbel in restraints. They were then escorted to a government car where they were placed in the back seat together.

35. During the drive from DRDC to the U.S. Court Building, Shimbel continued to verbally threaten Plaintiff.

36. Plaintiff arrived at the U.S. Court Building at the same time that Jefferson County Sheriff's Office deputies arrived to pick-up detainees. Plaintiff then learned that he was going to Jefferson County Detention Center and Shimbel was being transported to the Federal Detention Center.

37. Once in the holding area of the U.S. Marshal's office, a marshal removed restraints from inmates, including Plaintiff, while sheriff deputies replaced the restraints with their own. Plaintiff told the marshal, "I need to talk to someone about an assault." The marshal advised him to "take care of it at Jeffco." Plaintiff was then transported to the Jefferson County Detention Center.

38. Upon arrival at the detention center, and once alone with a deputy, Plaintiff informed a deputy and a nurse about the assault that had just occurred at DRDC and sought medical attention.

39. On September 19, 2007, the day after the assault, at approximately 9:30 a.m., Plaintiff suffered a severe anxiety attack requiring medical attention, in which his heart rate and blood pressure elevated and he hyperventilated. Medical personnel had him placed in the Medical Housing Unit as a result.

40. On September 24, 2007, Plaintiff informed Jefferson County Nurse Suzanne Carpenter that he was in great need to see a counselor. When Nurse Carpenter asked why, Mr. Howard told her of the sexual assault at DRDC on September 18, 2007. Deputy John Hady, the nurse's escort, stepped into Plaintiff's cell and inquired about Plaintiff's allegations. Following their conversation, Deputy Hady had a counselor meet with Plaintiff.

41. Deputy Hady then conferred with Jefferson County Sergeant Al Vorhies who contacted DOC/DRDC employee Sheryl Saucido to report the sexual assault. Ms. Saucido advised Sergeant Vorhies that Plaintiff is a "drama queen" and "don't worry about it." Deputy Hady generated a report regarding the sexual assault which was provided to DOC/DRDC personnel.

42. DOC employee Saucido later contacted Sergeant Vorhies and confirmed that it was very possible that Plaintiff was placed in a cell with Shimbel.

43. No DOC official or employee has ever contacted Plaintiff about this sexual assault that occurred within their facility, despite Plaintiff's repeated attempts to contact and inform DOC officials and other employees.

## V. STATEMENT OF CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – Eighth Amendment and Fourteenth Amendment Violations – Cruel and Unusual Punishment
(Against All Defendants)

44.　Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

45.　Defendants were acting under color of state law in their actions and inactions at all times relevant to this action.

46.　Defendants were deliberately indifferent to an obvious risk of serious harm by putting Scott Howard into a situation which was virtually certain to, and did, result in a sexual assault.  This was without necessity, right, legal justification or excuse and with such conscious or callous indifference to the rights of the Plaintiff as to rise to a level repugnant to the conscience of a reasonable person.

47.　Defendants knowingly inflicted unnecessary and wanton pain upon Plaintiff by allowing dangerous inmates, such as Simon Shimbel, access to him despite the fact that Inmate Shimbel was listed in DCIS as a known member of an STG and specifically named as a "custody issue" related to Plaintiff Howard, in violation of Scott Howard's right to due process and to be free from assaults under the Eighth and Fourteenth Amendments.

48.　Defendant Sergeant Jane Doe exhibited deliberate indifference to the substantial risk of harm inflicted upon Scott Howard by failing to ensure that Mr. Howard was not placed in a cell with a known custody issue despite the known risk of substantial harm custody issues, such as Inmate Shimbel, posed to inmates, such as Mr. Howard.

11

49. Defendants Zavaras, Cantwell, Hall, and Zavislan ("Supervisory Defendants") knew of the substantial risk of serious harm posed by dangerous inmates listed as "custody issues" in another inmate's DCIS file to that inmate, such as Mr. Howard. Such deliberate indifference to the safety and protection of inmates resulted in the sexual assault Scott Howard.

50. Defendants failed to provide humane conditions of confinement for Mr. Howard by failing to implement practices, policies and procedures that protect inmates, including inmates such as Scott Howard, from the substantial risk of serious harm posed by dangerous inmates listed as "custody issues" in inmate's DCIS file, such as Mr. Howard's.

51. The Supervisory Defendants, by and through their official duties, failed to and continue to fail to properly train and/or supervise their employees regarding proper housing procedures and the protection of inmates from assault by "custody issues," resulting in inhumane conditions of confinement and a deliberate indifference to the substantial risk of serious harm to Scott Howard and other similarly situated inmates.

52. The inadequate training and/or supervision provided by the Supervisory Defendants results from a conscious or deliberate choice to follow a course of action from among various alternatives available to Defendants.

53. In light of the duties and responsibilities of the DOC and DRDC employees and officials who exercise control over individuals incarcerated within DOC, the need for scrutiny in specialized training, supervision and discipline regarding the safety and housing of inmates is so obvious, and the inadequacy of appropriate training and/or supervision is so likely to result in the violation of constitutional rights, such as those described herein, that the Supervisory Defendants are liable for their failure to appropriately train and/or supervise DOC personnel. Such failure to

12

properly train and supervise their employees was and continues to be the moving force and proximate cause of the violation of Scott Howard's constitutional rights and the rights of other inmates.

54. The acts or omissions of each Defendant were the legal and proximate cause of Mr. Howard's damages in that he suffered a sexual assault while in Defendants' custody.

55. As a direct and proximate cause and consequence of the unconstitutional policies, procedures, customs, and/or practices described above, Scott Howard suffered a sexual assault.

**WHEREFORE**, Plaintiff Scott L. Howard respectfully requests that this Court enter judgment in his favor and against Defendants, and award him all relief as allowed by law, including but not limited to, the following:

  a. Prospective injunctive and declaratory relief and other appropriate equitable relief;

  b. Actual economic damages as established at trial;

  c. Compensatory damages, including, but not limited to, those for future pecuniary losses, physical and emotional pain, suffering, inconvenience, humiliation, mental anguish, loss of enjoyment of life, and other nonpecuniary losses;

  d. Punitive damages for all claims allowed by law in an amount to be determined at trial;

  e. Pre-judgment and post-judgment interest at the highest lawful rate;

  f. Attorney's fees and costs; and

  g. Such further relief as justice requires.

**PLAINTIFF REQUESTS A TRIAL TO A JURY ON ALL ISSUES SO TRIABLE.**

Dated this 16th day of September 2009.

13

KILLMER, LANE & NEWMAN, LLP

*s/ David A. Lane*
_____
David A. Lane
Sara J. Rich
1543 Champa Street, Suite 400
Denver, Colorado  80202
(303) 571-1000
ATTORNEYS FOR PLAINTIFF